IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KENNETH S.,[1]                       )
                                     )
            Plaintiff,               )
                                     )
vs.                                  )    Civil No. 18-cv-0420-DGW[2]
                                     )
COMMISSIONER OF SOCIAL               )
SECURITY,                            )
                                     )
            Defendant.               )

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB in November 2014, alleging a disability onset date of February 10, 2010. After holding an evidentiary hearing, ALJ Stephen M. Hanekamp denied the application on September 29, 2017. (Tr. 18-30). The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1). Plaintiff exhausted his administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 12, 29.

## Issue Raised by Plaintiff

Plaintiff argues that the ALJ's assessment of his residual functional capacity (RFC) was not supported by substantial evidence in the following respects:

1.      The ALJ overlooked medical evidence demonstrating that plaintiff could not tolerate even occasional interaction with co-workers and supervisors; and

2.      The ALJ overlooked evidence indicating that plaintiff had poor coping skills.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled.   A negative answer at any step, other than at step 3, precludes a finding of disability.   The plaintiff bears the burden of proof at steps 1–4.   Once

the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 2019 WL 1428885, at *3 (S. Ct. Apr. 1, 2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Murphy v. Colvin,* 759 F.3d 811, 815 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**The Decision of the ALJ**

ALJ Hanekamp followed the five-step analytical framework described above. He determined that plaintiff had worked, but not at the level of substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of personality disorder, adjustment disorder, unspecified depressive disorder, and anxiety disorder, which did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to do work at all exertional levels, limited to tasks that involve working primarily with things rather than with other people, and that otherwise involve no more than occasional and superficial interaction with co-workers and supervisors (superficial defined as no negotiation, arbitration, mediation, confrontation, or supervision of others), and no direct interaction with the general public.

The ALJ found that plaintiff could not do his past relevant work. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because he was able to do other jobs that exist in significant numbers in the national economy.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1.    **Agency Forms**

Plaintiff was born in 1986 and was almost 24 years old on the alleged onset date. (Tr. 203). He had completed two years of college as of October 2014. He

had worked as an assembler and as a water treatment specialist in the military. (Tr. 207-210). He served in the U. S. Army from 2004 to 2010. (Tr. 214).

In a Function Report submitted in December 2014, plaintiff said he was unable to work because of "can't really be around people. Sleep is only 3 hrs. or so. Stress, desire to talk to people and do day to day things I find lacking and can not focus." (Tr. 222).

## 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in June 2017. (Tr. 37).

Plaintiff lived by himself in an apartment. He had some income from VA disability. (Tr. 39-40).

Plaintiff testified that he took some college classes after he was discharged from the Army. He stopped taking classes because his GI Bill benefits were about to run out. He said that "It also did not help that during the time my depression, anxiety and stress were at, I guess you could say, peak heights, peak heights because of a situation that had arised [sic] also throughout that time." (Tr. 46).

Plaintiff's testimony about his impairments generally was not directed to the period before his date last insured,

Plaintiff said had "sleep issues" where he might be awake for 36 hours and then not be able to wake up. (Tr. 43). This interfered with work and school. He thought it was connected to PTSD. (Tr. 46-47).

Plaintiff also had depression and anxiety. He had days where the combination of his symptoms was overwhelming and incapacitating. He

sometimes wondered why he had not killed himself.   (Tr. 48-49).

Plaintiff testified that he had no friends.   (Tr. 54).

A vocational expert (VE) also testified.   The ALJ asked him a hypothetical question which corresponded to the RFC assessment.   The VE testified that this person could not do plaintiff's past work, but he could do other jobs that exist in the national economy.   (Tr. 55-57).

### 3.    Relevant Medical Records

Plaintiff received medical treatment at John Cochran VA Medical Center in St. Louis, Missouri.   He was treated for both mental and physical symptoms.

Plaintiff was seen for a service connection disability examination in August 2010.   A psychologist concluded that he met the diagnostic criteria for diagnoses of PTSD with depressive features, mild, and depressive disorder NOS, moderate. (Tr. 651-655).   He was awarded 30% disability based on PTSD with alcohol abuse and 10% disability based on a foot condition.   The disability was effective February 11, 2010.[3]   (Tr. 321-322).

Plaintiff called the VA Medical Center in March 2011, "asking about psychiatry services."   He said that he had been diagnosed with delayed PTSD, and "even though he is fine now, sometime he could go off 'like a ticking time bomb.'" He declined to contact the PTSD clinic and agreed to keep his next scheduled appointment with the polytrauma team.   (Tr. 620).

Plaintiff was evaluated by a psychologist in July 2011.   He was described as "odd in his presentation."   He laughed while describing his past suicidal gestures.

---

[3] Plaintiff does not raise any issue as to the significance of his VA disability rating.

His thought content was circumstantial, tangential, difficult to follow and not goal-directed. His judgment was poor, and insight was fair. He was provided with treatment options. (Tr. 605-608).

In December 2011, plaintiff was evaluated on a referral to address issues related to rapid speech and possible hypomania. A psychologist noted that plaintiff drank heavily in order to sleep. His speech was mildly pressured, and affect was inappropriate to content. He was referred to the mental health clinic and to PTSD counseling. (Tr. 580-582). About two weeks later, a VA staff person noted that several attempts to reach plaintiff to schedule an appointment had been unsuccessful. (Tr. 578).

Plaintiff presented to the mental health clinic to establish PTSD counseling in June 2013. It was noted that he had been referred in December 2011. (Tr. 575). He was seen by a psychologist in July 2013. He was angry, asking, "Why did I get service connected [disability] for this years ago, but am just now receiving treatment?" He acted like he did not know of the letters and phone calls attempting to set up an evaluation. The doctor noted that he displayed tendencies to "externalize blame and provide interpersonally difficult responses." Plaintiff was "loquacious" and had to be redirected repeatedly. He said he spent most of his days drinking. He appeared to "take some pride in the amount he drinks." He said he was in danger of having his financial aid for school cut off because he was "too lazy to fill out the financial aid paperwork." The psychologist concluded that plaintiff had a longstanding pattern of interpersonal difficulties. He also concluded that plaintiff showed no symptoms of PTSD, and that, if he did have

7

PTSD at one time, his symptoms seemed to have resolved without treatment, "which would be unusual." Plaintiff was a poor candidate for psychotherapy but requested an appointment for pharmacotherapy. (Tr. 494-498).

Plaintiff was seen by Dr. Cherazard, a psychiatrist, in September 2013. Plaintiff said he had been irritable and anxious and believed that because of this condition he had been unable to work for the past three years. He was taking on-line college classes in algebra, and said he was not performing well in them. On exam, his eye contact, appearance, motor activity, mood, affect, speech, and thought process were all normal. He had no delusions, suicidal thoughts, or obsessive/compulsive symptoms. Concentration was good. Insight and judgment were impaired in that he believed that he had a drinking problem but that it was not a big problem yet. The Axis I diagnoses were mood disorder, NOS, and alcoholism. The Axis II diagnosis was personality disorder, NOS. Dr. Cherazard prescribed Mirtazapine (Remeron) and Depakote. (Tr. 462-466).

On the same day as the visit with Dr. Cherazard, plaintiff met with a psychology resident to formulate a treatment plan. He told her that his "interpersonal difficulties" were the most challenging of his presenting issues. He said he drank twelve beers a day and had a history of DUIs. He had received a general honorable discharge due to "alcohol rehab failure." He was taking classes and was very interested in getting his degree in chemistry. He said he was "drowning in algebra." His mood was aggressive at the start of the interview, but he was more cordial by the end. His affect was often inappropriate. Speech was pressured, and he needed to be redirected to stay on track. He acknowledged that

8

interpersonal relationships were difficult because "he doesn't give others a chance to talk." His thought process was circuitous. (Tr. 457-460).

A primary care Advanced Nurse Practitioner saw plaintiff for a physical problem in December 2013. She noted that he had not refilled his psychiatric medications since September and was binge drinking. She was to alert Dr. Cherazard. (Tr. 443-445).

Plaintiff walked into the VA clinic on November 3, 2014. He said he had depression, lack of interest, and no motivation. He was given an appointment with Dr. Cherazard on November 6, 2014. He complained of confusion, lack of concentration, anxiety, and depressed mood on and off for the past four years. He said he had to drop out of school because he could not concentrate. He was using his $1,700 per month student loan and disability payment to pay his hotel rent and utilities. He had difficulty sleeping and drank beer every night to fall asleep. He was not taking any psychiatric medications. On exam, his speech, thought process, thought content, memory, and concentration were all normal. He had no suicidal or violent ideation. Judgment and insight were fair. His mood was anxious. The diagnoses were mood disorder, NOS, and anxiety disorder, NOS. Dr. Cherazard prescribed Citalopram (Celexa) and Bupropion (Wellbutrin), and planned to refer plaintiff for psychotherapy. On the same day, plaintiff told a psychologist that he had failed to do a major project for an on-line class and "ended up losing a funding resource." Plaintiff asked about therapy resources in Belleville, Illinois, as that would be more convenient for him. The psychologist

told him about the East St. Louis VET Center.[4]   (Tr. 426-430).

Plaintiff was seen by an ophthalmologist in April 2015.   That doctor recommended a referral to psychiatry because plaintiff endorsed symptoms of depression, had rapid speech, and complained of irritability.   (Tr. 747).

On September 10, 2015, plaintiff was assessed by a psychologist because of a positive depression screen.   He said he had stopped drinking alcohol a few months earlier.   He said he could not work and could not be around people.   He was oriented, alert, and "not overly bizarre."   His affect was incongruent with speech/content.   Provisional diagnoses were unspecified depressive disorder and ineffective coping/personality features.   He was referred for further psychiatric treatment.   (Tr. 791-794).

Plaintiff's date last insured is September 30, 2015.

De. Cherazard saw plaintiff in October 2015.   Plaintiff was upset because he had been stopped by the police and arrested for "unjust causes."   The case against hm had been dismissed.   He said that he could not be around people and was anxious most of the time.   He went to school three to four days a week and was taking elective classes.   He denied the use of alcohol in the past four months.   He had not been on psychiatric medications for the past seven months.   On exam, his speech, thought process, memory, and concentration were all normal.   Thought content was anger about the justice system in that he felt he had been unfairly targeted by the police.   He had no suicidal or violent ideation.   Judgment and insight were fair.   His mood was frustrated and dysphoric.   The diagnoses were

---

[4] There is no indication in the record that plaintiff received treatment at the Illinois facility.

mood disorder, NOS, and adjustment disorder with depressed and anxious mood. Dr. Cherazard prescribed Lexapro and Quetiapine (Seroquel), and instructed him to return in two months. (Tr. 803-807).

Plaintiff saw Dr. Cherazard in December 2015. He complained that his VA benefits had been stopped and he was going to be homeless. He believed that his medications helped, and he denied the use of alcohol. He complained again about the incident with the police and said he had difficulty concentrating at school because he kept thinking about it. On exam, his speech, thought process, memory, and concentration were all normal. Thought content was anger about the police incident and about not getting VA and social security benefits. He had no suicidal or violent ideation. Judgment and insight were fair. His mood was dysphoric. The diagnoses were mood disorder, NOS, and adjustment disorder with depressed and anxious mood. Dr. Cherazard added Wellbutrin to his other medications to improve concentration. He was to return in three months. (Tr. 799-803).

### 4.     State Agency Reviewers' RFC Assessments

In January 2015, M. W. DiFonso, Psy.D., assessed plaintiff's mental RFC based on a review of the record. As is relevant here, she concluded that his interpersonal skills were moderately limited by social avoidance. She concluded that he was capable of semi-skilled work with modified social demands. She also concluded that his adaptive skills were within normal limits. (Tr. 68).

A second state agency reviewer agreed with Dr. DiFonso in May 2015. (Tr. 81).

**<u>Analysis</u>**

Plaintiff first argues that the ALJ's residual functional capacity analysis is flawed because he overlooked medical evidence that establishes that he cannot have even occasional interaction with supervisors and co-workers because of poor social interaction and poor coping skills.

While recognizing that plaintiff must show that he was disabled as of September 30, 2015, his brief focuses on the period from July 2013 to March 2016.   See, Doc. 21, p. 3.

Plaintiff offers a selective review of the evidence, highlighting that which is most favorable to him.   However, he fails to show that the ALJ ignored this evidence.   In fact, the ALJ considered this evidence in his review of the medical treatment.   (Tr. 25-27).   Further, plaintiff's argument ignores the visits with Dr. Cherazard in September 2013, November 2014, and October 2015.   As the ALJ pointed out, the findings on mental status exam at those visits were generally benign.   (Tr. 27).   In particular, plaintiff highlights the September 2013 assessment by a psychology resident while ignoring Dr. Cherazard's normal findings on the same day.   Doc. 21, p. 6.

Plaintiff argues that the ALJ failed to consider an "entire line of evidence" regarding his inability to cope with the normal stresses of work.   See, Doc. 21, p. 11.   He is referring to two notes, from September 2013 and September 2015, referring to ineffective coping skills.   (Tr. 547, 792-793).   However, there is no indication that the treatment providers who wrote those notes were assessing plaintiff's ability to cope with workplace stress; rather, the context of the notes

suggests that they were addressing his ability to cope in social/personal interactions.

Plaintiff's argument is nothing more than an invitation to the Court to reweight the medical evidence, which the Court cannot do. *Burmester v. Berryhill*, ___ F.3d ___, 2019 WL 1499497, at *2 (7th Cir. Apr. 5, 2019), and cases cited therein.

Plaintiff's argument also ignores significant portions of the RFC assessment. The ALJ went beyond simply limiting him to occasional interaction with supervisors and co-workers. Rather, he was limited to tasks that involve working primarily with things rather than with other people, and that otherwise involve no more than occasional and superficial interaction with co-workers and supervisors (superficial defined as no negotiation, arbitration, mediation, confrontation, or supervision of others), and no direct interaction with the general public. Plaintiff's argument fails to grapple with the entirety of the limitations assessed.

Lastly, as a throw-away argument at the end of his brief, plaintiff suggests that the evidence regarding his daily activities shows he has a marked limitation in ability to adapt and manage himself, and that he meets the "B Criteria" of an unspecified Listing. Doc. 21, pp. 12-13. Plaintiff has burden of showing that he met *all* of the requirements of a Listing as of his date last insured. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). His bare-bones assertion does not come close to meeting that burden.

In short, the medical records and the state agency reviewers' opinions provide substantial support for the ALJ's RFC assessment. The isolated parts of

the record cited by plaintiff do not undermine that support.

This is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence. Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. He has not identified a sufficient reason to overturn the ALJ's conclusion.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Hanekamp committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE: April 29, 2019.**

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**

14